

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00056-CV

———————————————

JEREMY HAGGARD, Appellant

V.

BLATTNER ENERGY, INC., Appellee

On Appeal from the 415th District Court
Parker County, Texas
Trial Court No. CV25-0034

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

Appellant Jeremy Haggard was injured on the job at an Iowa wind farm when a crane operator struck him with a suspended load, knocking him off an elevated platform. At the time, Haggard was not wearing any fall-protection equipment. He sued among others Appellee Blattner Energy, Inc.—which neither employed him nor contracted with his employer—for negligence and gross negligence. Blattner moved for both a no-evidence and traditional summary judgment, arguing that it owed Haggard no duty of care because it neither retained contractual control nor exercised actual control over his work. The trial court granted the motion, severed Haggard's claims against Blattner, and adjudged that he take nothing from it.

On appeal, Haggard maintains that the trial court erred (1) by granting summary judgment because genuine issues of material fact exist on whether Blattner owed him a duty of reasonable care and (2) by sanctioning him with merits-preclusive deemed admissions that Blattner offered as summary-judgment evidence. Because Haggard did not meet his summary-judgment burden and failed to show harm from the deemed admissions, we will affirm.

## I. Background

### A. The repowering project

NextEra Energy[1] owns the Crystal Lake II wind farm in Iowa. As part of a large project to retrofit, upgrade, and repower the farm's wind-turbine generators, NextEra entered into a "Wind Turbine Generator Repowering Agreement" with Blattner and a "Master Equipment Supply and Commissioning Agreement" with General Electric International Inc. (GE). The NextEra–Blattner repowering agreement is not in the record, so we do not know the exact terms defining the relationship among NextEra, Blattner, and GE.

But a NextEra corporate representative testified that Blattner and GE had "independent roles . . . on the project." Another of its representatives described NextEra's having a "contract with the EPC [Blattner] and the OEM [GE] to complete the project." Thus, in general terms, Blattner—the EPC—provided engineering, procurement, and construction services to NextEra, while GE—the original equipment manufacturer—supplied equipment, removed used parts, and assisted NextEra in commissioning—that is, restarting—the rebuilt wind turbines.

A NextEra representative broadly summarized Blattner's mechanical work: it would isolate a tower from electricity, remove vintage GE components, set them on the ground, install and rewire new GE components, inspect, and certify that its work

---

[1]Two NextEra Energy entities are mentioned in the record, but we generally refer to NextEra Energy because it is unclear which owns the wind farm.

was done. NextEra would then inspect and issue a certificate of mechanical completion, and Blattner would go to the next tower.

GE disassembled and removed the used parts that Blattner had placed at each tower's base and eventually assisted NextEra in commissioning the refurbished turbines. Per GE's contract with NextEra, GE reclaimed ownership of the used parts, which included the nacelles—the large structures that housed each turbine and associated equipment.[2] After GE finished scrapping and removing the used parts, Blattner "reclaimed the area by . . . decompact[ing] the soil or seeding it if need[ed]."

---

[2]This photo shows an intact clipper nacelle on the ground with an arrow to the panel (lower half) being removed at the time of the accident:



To complete their respective work, both Blattner and GE hired subcontractors, and the following chart depicts the basic relationship among NextEra, Blattner, GE, and one of those subcontractors—C2 Logistics, which employed Haggard:



## B. The accident

On June 26, 2019, Blattner reached mechanical completion at Tower 143, and its old nacelle was sitting at the tower's base. Twenty-three days later, a C2 Logistics crew was disassembling the nacelle and moving its parts with a rough terrain crane when Haggard was injured.

Haggard worked as a rigger. He hooked parts to the crane, signaled instructions to the crane operator, and served as the crane crew's foreman. While standing atop Tower 143's old nacelle without any fall protection, Haggard rigged up a large panel.

Haggard testified that the crane operator "let this load swing out of control and knocked [him] off of" the nacelle's platform. Haggard estimated that he fell around five to eight feet, hitting his abdomen on the crane's stowage container, before falling another five or six feet to the ground.

Various persons—including Blattner's "safetyman"—responded to aid him and called for an ambulance. Haggard was taken to the hospital where he was treated.

As part of the Iowa OSHA's accident investigation, a GE representative explained the following about the relationships among the parties on site:

Next[E]ra is GE's customer and owner of the Crystal Lake 2 wind farm.

GE's scope at the Crystal Lake site includes the supply of replacement components and the removal and transfer of existing nacelles (Clipper nacelles). Blattner is contracted directly with NextEra (no contractual tie to GE) for the removal and grounding of existing nacelles from the towers and installation of the new replacement GE nacelles.

GE entered into a separate sale agreement for the used components and associated metal content with Praetorian Holdings Group, which also includes the disassembly and disposal of the nacelle components once placed on the ground by others. Pursuant to its contract with GE, Praetorian purchases and takes title to the nacelle components before they are removed from site for purposes of disposal and/or recycling. For the Crystal Lake site, Praetorian directly contracted with C2 Logistics for the mechanical disassembly and scrap metal removal and transportation of the used components. It is my understanding that C2 was uniquely qualified for the disassembly work on the Clipper equipment as their team included individuals who supported the installation of the original units. As an independent contractor, C2 had full control over this scope of work, including all methods, sequence, procedures[,] and equipment used to fulfill its scope.

OSHA did not contact Blattner during its investigation.

## C. The lawsuit

Haggard initially sued C2—which did not have worker's compensation insurance—and another entity for negligence and gross negligence. He later joined Blattner, a NextEra entity, and a Praetorian entity. The litigation has been contentious, leading the trial court to at one point deem admitted the following requests for admission that Blattner had propounded:

22. The Accident could have been prevented had [Haggard] properly used safety equipment at the Site on July 19, 2019[—the day of the accident].

23. Blattner was not responsible for [Haggard's] training in relation to the work [he] performed at the Site.

24. Blattner was not responsible for [Haggard's] work performed at the Site on July 19, 2019.

25. Blattner was not responsible for C2's work at the Site on July 19, 2019.

26. Blattner's work on the subject windmill was complete more than seven days prior to July 19, 2019.

27. Blattner was not working in or around the immediate vicinity of the subject windmill on July 19, 2019.[3]

---

[3]Haggard's former counsel made boilerplate objections to these six requests. In response to a draft motion to compel, he agreed to amend his responses but did not do so before Haggard's deposition. Blattner moved to compel and requested sanctions. As the hearing approached, Haggard's counsel "parted ways" with his firm, and another lawyer worked to correct and supplement the discovery responses, including removing objections and providing qualified denials to the six requests. But the trial court was unpersuaded, declaring, "I think I'm stuck with the rule on those admissions." At a later hearing on Haggard's motion to withdraw the deemed admissions, his counsel conceded that the former counsel "was probably a little too

The trial court denied Haggard's request to withdraw these deemed admissions.

After discovery had closed, Blattner filed a traditional and no-evidence motion for summary judgment that primarily focused on whether it owed a legal duty to Haggard. In support of its arguments, Blattner attached the deemed admissions, OSHA-investigation documents, deposition excerpts, and an affidavit from Blattner's site-safety coordinator. Haggard responded with several deposition transcripts and his safety expert's affidavit and report. One of Haggard's former co-workers and his safety expert testified that Blattner was the "controlling employer" at the job site.

Both sides referenced the NextEra–Blattner repowering agreement and indicated that NextEra would separately provide a copy to the trial court for an *in camera* inspection based on an Agreed Protective Order, but the record does not affirmatively indicate whether NextEra did so.[4] The parties also objected to each other's summary-judgment evidence.

Without stating its reasons, expressly ruling on the evidentiary objections, or indicating that it had received or reviewed the NextEra–Blattner repowering agreement, the trial court granted Blattner's summary-judgment motion. At Blattner's

---

aggressive" in making objections, stated that he had paid an attorney's-fees sanction, and requested that the trial court allow Haggard to withdraw the deemed admissions.

[4]Haggard concedes in his reply brief that "[t]he full document was not filed with the trial court because of a protective order." The protective order is also not in the record.

request, the trial court severed Haggard's claims against Blattner and signed a final judgment that Haggard take nothing from Blattner. Haggard timely appealed.

## II. Summary Judgment

Among other summary-judgment grounds, Blattner argued that no evidence supported its owing a duty to Haggard. Blattner specifically argued that the record contained no evidence that it had hired or contracted with C2 or Haggard, exercised control over the manner and methods of C2's or Haggard's work, or actually controlled the accident site or C2's crane operations. But Haggard contends in his first issue that he produced sufficient evidence to raise a genuine issue of material fact on the duty element—by demonstrating either Blattner's retained contractual control or its exercising actual control over Haggard's work. On both theories, we disagree.

## A. Standard of Review

When a party moves for both a traditional and no-evidence summary judgment—as Blattner did—we first review the trial court's judgment under the no-evidence standards. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that no evidence supports an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which no evidence exists. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary-judgment evidence

9

that raises a genuine, material fact issue. *See* Tex. R. Civ. P. 166a(i) & 1997 cmt.; *B.C. v. Steak N Shake Operations, Inc.*, 598 S.W.3d 256, 259 (Tex. 2020).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We consider whether the evidence would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)).

If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). But we will sustain a no-evidence challenge when

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

10

*King Ranch*, 118 S.W.3d at 751 (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

## B. Applicable law and analysis

A common-law-negligence claim's elements are "(1) a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach." *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022) (citing *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998)). The threshold consideration in a negligence case is whether a defendant owes a legal duty to the injured party. *Id.* (citing *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)).

No general duty exists in Texas to control the conduct of third persons or to take action to prevent harm to others absent certain special relationships or circumstances. *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 504 (Tex. 2017); *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000). But "one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby." *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 597 (Tex. App.—Fort Worth 2008, pet. denied) (quoting *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976)). "A voluntary undertaking gives rise to liability for physical harm if the actor fails to exercise reasonable care in performing the undertaking." *Elephant Ins.*, 644 S.W.3d at 151. "The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant acted in a way that requires the

11

imposition of a duty where one otherwise would not exist." *Id.* (quoting *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013)).

In workplace-safety cases, a "plaintiff must show that the party it asserts had a duty to provide a safe workplace had actual control or a right of control over the specific aspect of the safety . . . of the premises that led to the plaintiff's injury." *Lippert Components, Inc. v. Williams*, No. 01-22-00501-CV, 2025 WL 1256624, at *11 (Tex. App.—Houston [1st Dist.] May 1, 2025, pet. filed). A premises owner or a general contractor ordinarily owes no general duty to an independent contractor's employees. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). But a duty of care may arise if the owner or general contractor retains some control over the manner in which the independent contractor performs its work. *Id.* (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985)). Control can be established in two ways: "first, by evidence of a contractual agreement that explicitly assigns the [party] a right to control; and second, in the absence of a contractual agreement, by evidence that the [party] actually exercised control over the manner in which the independent contractor's work was performed." *Id.*

## 1. Retaining contractual control

Haggard argues that he produced summary-judgment evidence that Blattner owed him a duty because it retained contractual control. Blattner responds that because (1) it had no contractual relationship with Haggard's employer and (2) the NextEra–Blattner repowering agreement is not in the summary-judgment record,

12

Haggard did not carry his burden on Blattner's alleged retained contractual control. We agree with Blattner.

"A contract may impose control upon a party thereby creating a duty of care." *Id.* (citing *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999)). To be liable for an independent contractor's acts, a general contractor "must have the right to control the means, methods, or details of the independent contractor's work. Further, the control must relate to the injury the negligence causes, and the contract must grant the contractor at least the power to direct the order in which work is to be done." *Id.*

In analyzing whether a right to control exists, our goal is to determine the contracting parties' true intentions as expressed in their written agreement. *Dynergy Midstreams Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Among other construction canons, we focus on the contract's words and their plain meaning, unless the contract indicates that the parties intended a different meaning, as we read the document as a whole and without isolating any provisions. *Coker*, 650 S.W.2d at 393.

As we discussed above, Blattner and GE had separate contracts with NextEra, and C2 Logistics was a GE sub-subcontractor. In fact, Haggard's summary-judgment response did not dispute that Blattner had no direct contract with his employer. Rather, Haggard asked the trial court to focus on the NextEra–Blattner repowering agreement—an agreement that Haggard did not file but said NextEra would submit for an *in camera* inspection based on the contract's alleged confidentiality. But

13

Haggard's failure to produce the repowering agreement as summary-judgment evidence prevented him from raising a genuine issue of material fact that Blattner retained contractual control. *See* Tex. R. Civ. P. 166a(i).

Haggard's summary-judgment response included screenshotted excerpts from the alleged confidential repowering agreement that he argued demonstrated Blattner's "complete control" of the work site:

**2.18   Labor and Other Personnel.**

2.18.1 <u>Engagement of Labor</u>. Contractor shall provide, supervise, manage and otherwise have complete control over, and responsibility for, all Labor and other personnel performing the Work and Contractor's other obligations under this Agreement, including a Contractor Project Manager, a Contractor Site Manager, a Site Safety Coordinator, and an Electrical Construction Supervisor, and all such Labor and other personnel shall have had extensive experience performing work similar in technology, scope and magnitude to the Work that each will be performing and shall have received formal, documented training and, if applicable, certification in their respective areas of expertise. To the extent required by Applicable Law, Contractor shall employ only licensed personnel in good standing with their respective trades and licensing authorities to perform the Work. Contractor shall require each Subcontractor to adhere to the same standards with respect to its Labor and other personnel performing any of the Work.

**2.19   Safety and Emergencies.**

2.19.1 <u>Safety</u>. Contractor shall institute and, at all times during the performance of the Work, maintain in conformity with Applicable Laws and Applicable Permits safety precautions and programs designed to prevent injury to all Persons (including members of the general public and the agents, invitees, representatives and Labor and other personnel of Owner, Contractor, Other Owner Contractors and Subcontractors and prevention of injury by local flora and fauna) and all public [and

14

private property . . . that is on or near the Project Site or is otherwise affected by the performance of the Work.][5]

Haggard also included the following screenshot purportedly from Blattner's safety manual that was attached to the repowering agreement:

20. Fall Protection

All employees shall wear a full body safety harness (provided by Blattner Energy) when working six feet or more above the ground or when working in a precarious position (with the exception of crane assembly/disassembly).

The lanyard shall be securely attached to the employee 100% of the time and shall be rigged as such that the employee can neither free fall more than 6 feet (1.8m), nor contact any lower level.

Snap hooks are not to be attached:

- Directly to webbing, rope[,] or wire rope

- To each other

- To a D-ring to which another snap hook or other connector is attached

- To any object which is incompatibly shaped or dimensioned in relation to the snap hook such that unintentional disengagement could occur

- On suspended scaffolds or similar work platforms.

---

[5]Regarding Paragraph 2.19, Haggard pointed to Blattner's corporate representative's deposition testimony where Haggard's counsel read from the paragraph, and the witness then confirmed, "That's what it says." Yet the witness immediately quibbled over the term "capital W, Work"—repeatedly saying "our work," explaining that Blattner's "scope didn't include the scrapping or commissioning of these towers." Haggard included a more complete screenshot of Paragraph 2.19 in his safety expert's report.

Notably, instead of attaching to his summary-judgment response the agreement and its attached safety manual containing these paragraphs, Haggard merely pointed to the agreement's future *in camera* submission. He also attempted to backfill what the unfiled agreement said by pointing to several deposition excerpts in which witnesses were asked about selective terms and provisions in the repowering agreement.

A summary-judgment "response itself is not competent summary[-]judgment evidence," *Robles v. Cox Ins. Group, LLC*, No. 02-21-00088-CV, 2022 WL 188377, at *3 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op.); *Rhodes v. Interfirst Bank Fort Worth*, 719 S.W.2d 263, 264 (Tex. App.—Fort Worth 1986, no pet.), so we question whether it is even appropriate to consider Haggard's response's unauthenticated screenshots without his either attaching the repowering agreement to his response or pointing out where it was otherwise "on file" in the trial court's record, *Kuo v. Regions Bank*, 722 S.W.3d 15, 16 (Tex. 2025). But even were we to consider the screenshots of the repowering agreement, or the various pointed-out deposition excerpts concerning the agreement, we face a more fundamental contract-construction problem: we are being asked to construe the agreement's paragraphs in isolation, including without having the agreement's defined terms— notably "Labor," "the Work," and "employees."

For instance, although Paragraph 2.18.1 talks about Blattner's having "complete control over, and responsibility for, all Labor and other personnel performing the Work," Haggard has not demonstrated that GE and its subcontractors

16

fell within the terms "Labor" or "Work." Those defined terms are not in the record. Additionally, the safety-manual excerpt references "employees," but it does not provide that employees—beyond Blattner's own—are included.

Blattner included in the summary-judgment record a paragraph from the repowering agreement expressly limiting its application to third parties. But we have nothing to fill in the gaps from the omitted defined terms and other provisions that could elucidate the extent that Blattner retained any contractual responsibility, if it did, for the actions of third-party employees—like those from C2—who were working on GE's part of the repowering project.[6] In fact, based on the record before us, it is unclear whether it is even correct to classify Blattner as *the* or *a* general contractor of the entire repowering project; the devil is in the contractual details that Haggard did not produce.

Blattner argues that because Haggard did not produce the repowering agreement in the summary-judgment record to be included in the appellate record, we "must presume that the omitted evidence supports the trial court's judgment." *See Enter. Leasing Co. of Houston v. Barrios*, 156 S.W.3d 547, 550 (Tex. 2004). We are not

---

[6]Haggard cites *Lawson-Avila Constr., Inc. v. Stoutamire*, in which the San Antonio Court of Appeals determined that a general contractor had retained the contractual right to control the safety of its subcontractors. 791 S.W.2d 584, 590 (Tex. App.—San Antonio 1990, writ denied). The case is distinguishable because the contract at issue was before the court of appeals and involved a general contractor and its subcontractor. *Id.* Here, Blattner had no contract with C2, and the repowering agreement between NextEra and Blattner is not in the record.

sure if the trial court reviewed the repowering agreement *in camera*, but neither party has suggested that the trial court did not, nor has either requested that the trial-court clerk include the unfiled repowering agreement in the appellate record. Under such circumstances, to the extent that the trial court considered the repowering agreement to be admissible evidence (which is highly questionable given that NextEra submitted it *in camera* instead of filing it),[7] we must presume that the missing repowering agreement did not raise any fact issues that would have precluded the trial court's granting Blattner's no-evidence summary-judgment motion. *See, e.g., Brown v. Cocco*, No. 05-23-01151-CV, 2025 WL 2606627, at *2 n.3 (Tex. App.—Dallas Sept. 8, 2025, no pet.) (mem. op.) (presuming that missing records that had been submitted *in camera* did not preclude summary judgment).

But even assuming that the trial court either (1) never received the agreement from NextEra or (2) did and concluded that the *in-camera*-submitted repowering

---

[7]Both parties' summary-judgment filings assumed that the trial court could review the repowering agreement *in camera* upon NextEra's delivery. Although it is unclear that this occurred, such a process was procedurally flawed. The summary-judgment rules require that evidence be "on file," and in response to a no-evidence motion, the nonmovant must produce summary-judgment evidence. *See* Tex. R. Civ. P. 166a. A nonmovant can either attach evidence to the response or simply point out evidence that is already "on file." *Kuo*, 722 S.W.3d at 16. But other than as narrowly allowed by statute, *see, e.g.*, Tex. Gov't Code Ann. § 552.3221; *Hart v. Gossum*, 995 S.W.2d 958, 961 (Tex. App.—Fort Worth 1999, no pet.), the rules of civil procedure do not expressly permit a party to submit summary-judgment evidence *in camera* without filing it. *See* Tex. R. Civ. P. 166a. Rather, to maintain the confidentiality of filed summary-judgment evidence, the procedural rules permit parties to ask a trial court to seal court records, *see* Tex. R. Civ. P. 76a—a process that the parties did not invoke.

agreement constituted no evidence of retained contractual control, Haggard still cannot prevail. Haggard's evidence needed to raise a genuine issue of material fact that Blattner had the contractual right to control the means, methods, or details of C2's work related to Haggard's injury and the power to direct such work. *See Bright*, 89 S.W.3d at 606. None of Haggard's repowering-agreement screenshots or the mostly conclusory deposition snippets about the agreement demonstrate that requisite level of control over the operative details of C2's work. Thus, in the absence of his filing the entire repowering agreement—including all its defined terms—we conclude that Haggard failed to produce summary-judgment evidence sufficient to raise a genuine issue of material fact that Blattner owed him a duty as C2's employee through retained contractual control. *See id.* at 607 (citing *Elliott–Williams*, 9 S.W.3d at 804).

### 2. Exercising actual control

Haggard alternatively argues that the trial court should not have granted summary judgment because he produced sufficient evidence to raise a fact issue that Blattner exercised actual control over C2's work during the injury-causing event. But we conclude that Haggard's summary-judgment evidence did not raise a fact issue that Blattner exercised actual control over C2.

A party who exercises actual control over a contractor's work may be subject to direct liability for negligence. *Id.* But "the control must relate to the injury the negligence causes," *id.* (quoting *Elliott–Williams Co.*, 9 S.W.3d at 804), and must extend

to the "operative details" of the contractor's work, *see Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 156 (Tex. 1999).

"Merely exercising or retaining a general right to recommend a safe manner for the independent contractor's employees to perform their work is" not enough to subject a premises owner or general contractor to liability. *Massage Heights Franchising, LLC v. Hagman*, 712 S.W.3d 615, 622 (Tex. 2025) (citing *Koch*, 11 S.W.3d at 155); *Lippert Components*, 2025 WL 1256624, at \*12. Similarly,

> a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations . . . does not mean that the independent contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the independent contractor is not entirely free to do the work in his own way.

*Gonzalez v. Ramirez*, 463 S.W.3d 499, 506 (Tex. 2015) (citation modified). Owners and general contractors "can direct when and where an independent contractor does the work and can request information and reports about the work" without assuming vicarious liability. *Id.* (citing *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 792 (Tex. 2006)).

Holding otherwise "would deter general contractors from setting even minimal safety standards." *Bright*, 89 S.W.3d at 608. And the Texas Supreme Court has expressly stated that parties should not "be required to stand idly by while another is injured or killed in order to avoid liability. Nor do . . . the liability rules contemplate

20

putting those who employ independent contractors in that position." *Id.* (citation modified); *see also Fifth Club*, 196 S.W.3d at 792.[8]

For example, in *Koch*, the mere fact that Koch employed a safety employee to tell its independent contractor's employees if Koch observed them doing "something wrong" and to remind them to be safe was insufficient to establish actual control. 11 S.W.3d at 156. Such evidence was "not evidence that the independent contractor and its employee were not free to do their work in their own way" or that "Koch controlled the method of work or its operative details." *Bright*, 89 S.W.3d at 608 (discussing *Koch*, 11 S.W.3d at 156).

For a duty to arise through exercising actual control over a job worksite—what is essentially a negligent undertaking—an affirmative course of action is required. *Elephant Ins.*, 644 S.W.3d at 151–52; *see also Lippert Components*, 2025 WL 1256624, at *12 (collecting cases). To illustrate, in *Lee Lewis*, the court recognized a general

---

[8]The Houston Fourteenth Court of Appeals has noted two other reasons "to question the wisdom of imposing liability" upon a party "for injuries sustained by an independent contractor['s employees]." *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 699 n.6 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). First, the independent contractor has often been hired for its expertise in the work to be done and its superior ability to see that the work is done safely. *Dyall v. Simpson Pasadena Paper Co.*, 152 S.W.3d 688, 698 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (op. on reh'g en banc) (citing *Lee Lewis Const. v. Harrison*, 70 S.W.3d 778, 796 (Tex. 2001) (Hecht, J., concurring)). Second, a party's liability for accidents should not increase the harder he tries to ensure that independent contractors work safely and decrease the less he cares what happens. *Id.* The rationale of subjecting landowners or general contractors to liability for injuries sustained by independent contractors is inconsistent with the modern system of worker's compensation. *Id.* at 698–99.

contractor's exercise of actual control because the general contractor not only knew of a dangerous condition before an injury occurred but then expressly approved the independent contractor's dangerous and unsafe acts. 70 S.W.3d at 784 ("There was testimony that C.L. Lewis 'definitely did approve' the lanyard [fall-protection] system.").

In contrast, in *Bright*, the court held that a general contractor had not exercised actual control when it had neither known of a prior dangerous condition nor specifically approved of a dangerous act. 89 S.W.3d at 609. Relatedly, in *HNMC, Inc. v. Chan*, a landowner who asked its neighbor to make its property safer had not undertaken that obligation itself simply by requesting changes. 683 S.W.3d 373, 382–83 (Tex. 2024).

And we have also stated that a party "who requires a subcontractor to use safety procedures is not responsible for the subcontractor's failure to use them." *Long v. Riedel*, 710 S.W.3d 381, 393 (Tex. App.—Fort Worth 2025, no pet.) (citing *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 652 (Tex. 2007)). Rather, a party "that promulgates mandatory safety requirements and procedures owes only a narrow duty to ensure that those requirements and procedures generally do not unreasonably increase, rather than decrease, the probability and severity of injury" to subcontractors' workers on the job site. *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 867 (2021).

### a. Haggard's testimony

With these principles in mind, we turn to Haggard's summary-judgment evidence, starting with his deposition testimony. Haggard testified that C2 employed him, but as for whether he knew of Blattner's having hired C2, he had "no knowledge of how all the uppers attended to everything." He "assume[d] that they [Blattner] were the . . . head honchos, basically" but "[did] not know anything as far as specified paperwork, roles[,] or agreements."[9] He knew that Blattner was a contractor because he saw its trucks and employees, but he was not sure whether Blattner was "over the whole job."

Haggard testified that Jamie Marcos was C2's project and site supervisor. When Haggard arrived on the job, a C2 representative "went over the job site specifics, what [he] could and couldn't wear." Concerning written safety standards, Haggard recalled C2's representative giving him "a piece of paper" outlining the rules, including "making sure [he had his] PPE [personal protective equipment]."

Every day, C2 held a morning safety meeting for its crew at its tool trailer. Marcos led the daily meeting, "la[ying] out what was going to happen that day, . . . telling everybody what site they would be working on[, and] . . . mak[ing] sure everybody had their boots on and . . . their hard hats on." Haggard testified that on

---

[9]Haggard did not know that GE was involved until after the accident.

23

the day of the accident, Marcos had conducted the morning's safety meeting and had instructed him to go to Tower 143.

Regarding Blattner, Haggard testified that it did not provide any instructions on C2's crane operations and was not directing C2's employees when the accident occurred. Haggard also confirmed that Blattner did not provide him with any training concerning crane operations or C2's scrapping work, and he did not see Blattner provide such training to any other C2 employee.

In fact, Haggard had no direct communication with Blattner's or NextEra's employees. He testified that Blattner's safetyman rode around in a Blattner truck but that they never spoke until after the accident.

Haggard did not recall anyone from NextEra, Blattner, or GE being present at Tower 143 on the day of the accident. Haggard testified that he "never visually laid eyes" on Blattner working on Tower 143 during his time at the project and did not know if it was working on adjacent towers. Not until Haggard lay on the ground after the accident did he see Blattner's safetyman and other people he thought were Blattner employees at Tower 143 as they administered first aid to him before the ambulance arrived.

Haggard testified that he and his C2 coworkers did not wear fall protection, and he testified about Blattner's safetyman stopping C2's work once, weeks before the accident:

Two weeks before this happened, the safety guy on the job site, that was there in a Blattner truck, stopped and shut my job[]site down. John Rhodes and -- I'm wanting to say it was Marcos, Jim [C2's owner] may have possibly been on the job site and it was him that day. But two of them went over and spoke with the safety guy. About 20 minutes or so later they came back to me and told me I could resume. Later on I found out that they were discussing the fact that we were not able to harness to anything because everything we were actually to harness to was the very pieces that were actually taken apart.

Haggard did not participate in the conversation, but he said that "the safety guy okayed the way [they] were doing it and allowed [him] to go back to work." When asked to clarify what he knew of the conversation, Haggard said that when Rhodes returned to C2's worksite, he said "they were wanting to know why [Haggard] was not harnessed to something. And that they had explained to him that there is nothing to harness to . . . [a]nd if we was to harness to any of these parts, we can't reach the other parts to be taken apart." Nobody told Haggard that if there had been something to harness to, that he needed to do so because "there was nothing there specifically to harness to."[10] Haggard acknowledged that C2 had harnesses in its trailer and if they could have been used, "then [he was] sure they would have been."

---

[10]NextEra's corporate representative testified that "[s]ee something, say something is a general industry philosophy" that it encouraged of its contractors. Blattner's site-safety coordinator confirmed that NextEra's see-something-say-something "rule" led him to talk with GE's subcontractor about the work stoppage Haggard described. He averred that he referred the issue to GE's site-safety representative but "did not direct the subcontractor to continue working without fall protection."

### b. Rhodes's testimony

Haggard's summary-judgment response also relied on his co-worker John Rhodes's testimony. Rhodes was a crane operator. Near the start of Rhodes's deposition, Haggard's lawyer asked him whether he had worked on sites with multiple contracting parties and whether one party "kind of takes the lead as the controlling [entity], so to speak, and then there's other entities on site as well." Rhodes agreed, "Yes, sir. Just about every site I -- I go to has multiple contractors[,] but there's always a main." Haggard's counsel then asked Rhodes who he understood to be "the controlling employer under OSHA" at the Iowa wind farm, and Rhodes said Blattner.

Throughout the deposition, Rhodes continually referred to Blattner as the "controlling entity," which Blattner contested as being conclusory, but toward the end of Rhodes's deposition, he conceded, "Honestly, I don't know who [wa]s in control." Rhodes testified that he had "assumed that they [Blattner] were in control" because its "safety guys" had conducted an orientation in Blattner's trailer providing safety training when C2 arrived on the job site: "When we got there, . . . we were directed to Blattner to do safety training with them, and they were in charge or saying they were the controlling entity on site."[11] He explained that "they would tell us where we . . . were allowed to go and what to do"; "our instructions came from Blattner to

---

[11]Blattner's own corporate representative confirmed that under its agreement with NextEra, Blattner conducted safety meetings for not only its employees but also its subcontractors, NextEra's representatives, and GE's representatives.

where we could go, to what towers, and work on those towers throughout the job." "It was [Rhodes's] understanding that they were the big dogs."

But although Rhodes testified to Blattner's control of C2's work "progression"—meaning Blattner's control of where C2 went and what it worked on—he did not offer testimony that Blattner controlled the details of C2's disassembling and scrapping work at each tower. He acknowledged that Blattner was removing old nacelles, repowering new ones, and "doing site clean-ups"; "they did everything except for dismantl[ing] the old nacelle, which is what [C2] did." Rhodes testified that he had written C2's nacelle "disassembly procedure" in C2's training manual. He further testified that he, Haggard, and another C2 employee had trained C2's employees on the procedure.

Concerning safety, Rhodes confirmed that C2 had a safety meeting every morning. Marcos conducted the meetings and then told the C2 crew where C2 had been instructed to work. Blattner never spoke with C2's employees about fall protection other than the day Blattner stopped C2's work as Haggard had described.

And about that incident, Rhodes testified that Blattner's "safety guys" had stopped C2's work and asked if they had harnesses, and C2's employees had responded: "[N]o. What, are we going to hook to the sky? We're standing on top of a nacelle and it's not legal to hook to the crane."

So Blattner stopped C2's work, and they had a meeting to discuss the potential for mitigation. Rhodes said that he waited in a conference room while Marcos and

27

Blattner met in the safety room. Rhodes estimated that "after 30 minutes of them yapping about it and trying to figure it out," "they come out and said, 'Go back to work.' So, we just went back to work." "[S]o they wasted 30 minutes of our workday and sent us back to work with no -- no real mitigation from them. And they -- you know, they didn't have harnesses for us."

Rhodes further testified that he "did not ask anybody about what came out of that or what the big deal was, but . . . we didn't know what conclusion they reached except go back to work." During his deposition, Rhodes suggested that someone could have erected a scaffold with a retracing yo-yo system to prevent workers from falling to the ground, but he testified that "[t]he Blattner safety guys sent us back to work without any mitigation."

Rhodes also testified that Blattner had three "safety guys" in the general area where C2 was working every day. But he admitted that he was not present during Haggard's accident and had no personal knowledge of Blattner's presence at Tower 143 when the accident occurred. He arrived on the accident scene about 90 minutes later, observed Blattner's presence at the accident scene,[12] and concluded "[i]t was their puppy": "They were out there taking pictures, writing reports[;] [i]t would seem

---

[12]Rhodes said he observed the same Blattner employee "that gave us our little stand down for the safety harness crap."

28

to me that for somebody that's not supposed to be involved, they were pretty damn involved."[13]

### c. Haggard's safety expert's testimony

Haggard's summary-judgment response also cited his safety expert, who opined—despite OSHA's not investigating or citing Blattner—that "Blattner would be considered the controlling employer of the project site, as is defined by the OSHA multi-employer citation policy." He opined that Blattner met OSHA's "controlling employer" definition: "the employer with general supervisory authority over the worksite, and having the power to correct health and safety violations, or required others to do so."[14] Haggard's expert had concluded that "Blattner had control in practice at this site" and safety responsibilities "beyond just Blattner's own employees."

The expert based his opinions primarily on his interpretation of the NextEra-Blattner agreement and

> [f]rom the testimony of Mr. John Rhodes and·Mr. Haggard, yes, that they were taking direction from Blattner as to where to go and what to work. They're working -- the project schedule looks to be Blattner's schedule and coordination management. But as far -- I'm not saying

---

[13]Rhodes suggested that if Blattner was not involved, "they should have minded their own business like . . . NextEra['s employee], stayed their ass in their trailer."

[14]*See McClure v. Denham*, 162 S.W.3d 346, 353 (Tex. App.—Fort Worth 2005, no pet.) (discussing OSHA, U.S. Dep't of Labor, Directive Number CPL 2–0.124, https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=DIRECTIVES&p_id=2024#MULTI [https://perma.cc/KZB4-EATL]).

directing the crane controls or the lift. That's more to the project location and coordination.

Freely conceding that "Blattner was not directing or controlling the crane use of C2," Haggard's safety expert testified "that they [Blattner] have the general supervisory authority at this work site, period." The expert cited "Blattner['s] Site Specific Safety Program" calling for the use of fall-protection equipment—the Paragraph 20 concerning "Fall Protection" quoted above that is not in the record. And the expert focused on the "prior discussion [during the work stoppage], a recognition that there's not fall protection in use and that work was still allowed to resume in this manner, even after that hazard was identified."

### d. Application of the law to Haggard's evidence

Haggard argues in his reply brief that the opposing appellate briefs discussing this evidence "read like two different cases." He posits that Blattner "wants the [c]ourt to ignore Rhodes['s] deposition testimony and accept the evidence in the light most favorable to Blattner," and he asserts that "the record supports that Blattner exercised actual control." But applying the Texas Supreme Court's workplace-safety jurisprudence to the evidence under the no-evidence standard of review, we cannot agree that Haggard raised a fact issue on Blattner's alleged exercise of actual control.

Both Rhodes and Haggard testified to what entity controlled their disassembly work at each tower: C2. Rhodes wrote the training manual, and both employees trained other C2 employees in how to perform their work. Haggard worked as a rigger

30

on a C2 crane crew and directed the crew as its foreman: "I knew what had to be done[,] and I was the one that pointed fingers and got everybody . . . into position."

In contrast, Blattner gave no instructions and had no direct control over C2's disassembling operations. Rather, Blattner told C2 where to go on the work site. Then, C2—during its daily safety meeting—communicated which tower Blattner had told C2 to work on.

What is wholly lacking in the summary-judgment record is any indication that Blattner controlled the "operative details" of C2's scrapping and disassembling work. The evidence shows the opposite—C2 controlled those details.[15] *See JLB Builders*, 622 S.W.3d at 866 ("The control exercised must extend to the timing and sequence of the particular independent contractor's work, such as which of the subcontractor's employees should perform what task and at what point in time." (citation modified)); *Bright*, 89 S.W.3d at 607; *Koch*, 11 S.W.3d at 156.

Haggard attempts to avoid this evidentiary problem by broadly arguing that "Blattner actually controlled the work site." From this foundational assertion, Haggard points to the evidence that Blattner held a safety-orientation meeting for

---

[15]Neither Rhodes nor Haggard actually knew the relationship of Blattner to C2. So their speculative testimony about Blattner's being the "big dogs" or "head honchos" based on their assumptions is not evidence of Blattner's exercise of actual control over C2. *See 1701 Com. Acquisition, LLC v. Macquarie US Trading, LLC*, No. 02-21-00333-CV, 2022 WL 3904976, at *11 (Tex. App.—Fort Worth Aug. 31, 2022, no pet.) (mem. op.) ("A person's subjective beliefs are not competent summary-judgment evidence.").

persons coming to the wind farm, that it had safety employees on site, and that they had the right to stop—and did on at least one occasion stop—C2's work. None of this evidence is enough to subject Blattner, who was not shown to be C2's general contractor to liability. *See Massage Heights Franchising*, 712 S.W.3d at 622. Blattner was free to direct C2 on when and where it worked and to set minimal safety standards without becoming C2's insurer for its negligent acts. *See Bright*, 89 S.W.3d at 608.

Concerning Blattner's stopping C2's work and then allowing it to continue weeks before Haggard's accident, Blattner had no contractual relationship with C2, and Haggard presented no evidence that Blattner was a general contractor over GE's—and its subcontractors'—scope of work. Additionally, the record contains no evidence about what Blattner said to Marcos in the work-stoppage meeting because neither Rhodes nor Haggard attended that meeting. And Rhodes did not testify that Blattner gave a specific directive to C2 or affirmatively approved C2's work. Rhodes testified that he "didn't know what conclusion they reached except to go to work." So this case is unlike *Lee Lewis*, in which a proven general contractor explicitly approved a fall-protection system. *See* 70 S.W.3d at 784.[16]

---

[16]In his reply brief, Haggard quotes *JLB Builder* for the proposition that "evidence showing a general contractor personally observed a safety hazard and nonetheless approved of continuing the work raises a fact issue as to actual control." 622 S.W.3d at 868 (citing *Lee Lewis*, 70 S.W.3d at 783–84). But that quote is inapplicable because Haggard has not shown that Blattner was a general contractor concerning GE's or C2's work and because in *Lee Lewis*, the general contractor specifically approved its contractor's fall-protection system. 70 S.W.3d at 784. Here, Haggard did not produce evidence of what Blattner (or anyone else) actually said in

But even if we were to assume that Blattner promulgated safety requirements or procedures concerning fall protection that C2 did not follow before or after Blattner stopped C2's work, Blattner "owe[d] only a narrow duty to ensure that those requirements and procedures generally [did] not unreasonably increase, rather than decrease, the probability and severity of injury" to C2's employees.[17] *See JLB Builders*, 622 S.W.3d at 867 (quoting *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 358 (Tex. 1998)). Blattner was not responsible for C2's failure to use fall protection, and Haggard does not suggest that Blattner was liable under the narrow duty to not unreasonably increase the probability and severity of injury. *See id.*; *see also Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 652; *Long*, 710 S.W.3d at 393.

---

the work-stoppage meeting or of Blattner's affirmative requirement or directive to C2 to work without fall-protection equipment. The supreme court allows a party to have the general right to stop work, to order it to resume, and even to "make suggestions or recommendations which need not necessarily be followed" and not have such conduct constitute an exercise of actual control. *See Gonzalez*, 463 S.W.3d at 506 (quoting *Koch*, 11 S.W.3d at 155). Here, Haggard failed to offer any evidence that Blattner made any affirmative directives to C2; at best, the evidence showed that Blattner allowed C2 to continue working knowing that C2 itself was not requiring its workers to wear fall protection.

[17]Haggard has also not demonstrated that the repowering agreement's safety provisions—which are not in the record—established Blattner's affirmative right to control C2's work. *See Bright*, 89 S.W.3d at 609 (no duty imposed on premises owner where premises owner "had a Safety Incentive Program that rewarded contractors who had achieved certain safety milestones"); *Brazos Contractors Dev., Inc. v. Jefferson*, 596 S.W.3d 291, 303–04 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (distinguishing between contractual provisions addressing affirmative rights concerning completing an underlying project and those "merely addressing safety").

We also reject Haggard's attempt to point to the evidence of Blattner's employees' responding to the accident, rendering emergency medical aid, and calling an ambulance—while NextEra's employees sat in the trailer. That evidence does not show Blattner's control over what caused Haggard's injury, and it is evidence only that after Blattner learned of the accident, its employees tried to help Haggard. Haggard has cited no authority—nor have we found any—suggesting that a court can or should infer a party's liability from the mere fact of its responding to a work-site accident. Such a conclusion would fly in the face of the supreme court's concern over a contractor's "stand[ing] idly by while another is injured or killed in order to avoid liability." *Bright*, 89 S.W.3d at 608 (quoting *Mendez*, 967 S.W.2d at 358); *cf.* Tex. R. Evid. 409 (stating that evidence of furnishing, promising to pay, or offering to pay certain medical expenses resulting from an injury "is not admissible to prove liability for the injury").[18] Thus, Blattner's responding to render emergency aid to Haggard and calling 911 is not evidence that it exercised actual control over C2's work that caused the accident.

Finally, Haggard cannot point to his safety expert's opinions, which were largely premised on (1) his legal interpretation of the NextEra–Blattner repowering

---

[18]*See also* Mark B. Greenlee, *Echoes of the Love Command in the Halls of Justice*, 12 J.L. & Religion 255, 263 (1996) ("[C]ourts protect Good Samaritans from the inference of liability from acts of kindness by excluding such acts from evidence. Not to do so would penalize the Good Samaritan and . . . encourage the heartless to pass by on the other side." (citation modified)).

34

agreement that is not in the record, *see 1701 Com. Acquisition*, 2022 WL 3904976, at *11–12 (stating that legal conclusions are not competent summary-judgment evidence); and (2) Haggard's and Rhodes's testimonies, which as we have discussed constituted no evidence of Blattner's exercise of actual control. Nor does Haggard raise a fact issue by relying on his safety expert's opinion about OSHA's muti-employer directive concerning who is a "controlling entity." *See Grant v. Wind Turbine & Energy Cables Corp.*, No. 02-21-00036-CV, 2022 WL 2840142, at *9 n.22 (Tex. App.—Fort Worth July 21, 2022, no pet.) (mem. op.). Indeed, "Texas courts have held that the common[-]law duties imposed by state law are not expanded by OSHA regulations"—"either a [defendant] owes a duty based upon our common[-]law principles, or it does not." *Id.* (first citing *Hill v. Consol. Concepts, Inc.*, No. 14-05-00345-CV, 2006 WL 2506403, at *4 (Tex. App.—Houston [14th Dist.] Aug. 31, 2006, pet. denied) (mem. op.); and then citing *McClure*, 162 S.W.3d at 353).

Here, Haggard needed to produce evidence raising a genuine issue of material fact that Blattner actually controlled the manner, method, or details of C2's injury-causing activity. And he did not. Haggard produced no evidence that Blattner retained "such . . . a right of supervision that [C2 was] not entirely free to do the work in [its] own way." *Gonzalez*, 463 S.W.3d at 506 (quoting *Koch*, 11 S.W.3d at 155). Thus, we conclude that Haggard failed to produce evidence raising a genuine issue of material fact that Blattner exercised actual control over C2's crane operations that led to Haggard's injuries necessary to impose a duty on Blattner. *See id.*

Accordingly, the trial court properly granted Blattner's no-evidence summary judgment on Haggard's negligence claim. And we further conclude that the trial court properly granted summary judgment on Haggard's gross-negligence claim. *See Taylor v. Baylor Scott & White Med. Ctr.-Frisco*, No. 05-20-00352-CV, 2022 WL 405896, at *9 (Tex. App.—Dallas Feb. 10, 2022, no pet.) (mem. op.) (first citing *Sonic Sys. Int'l, Inc. v. Croix*, 278 S.W.3d 377, 394–95 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); and then citing *Seaway Prod. Pipeline Co. v. Hanley*, 153 S.W.3d 643, 659 (Tex. App.—Fort Worth 2004, no pet.)). We overrule Haggard's first issue.

### III. Deemed Admissions

In his second issue, Haggard complains that the trial court abused its discretion by deeming admitted the six requests for admission cited above and by denying his request to withdraw them. Assuming that the trial court abused its discretion, Haggard has not shown harm.

Requests for admission are intended to simplify trials by eliminating "uncontroverted matters or evidentiary ones like the authenticity or admissibility of documents." *In re Euless Pizza, LP*, 702 S.W.3d 543, 546 (Tex. 2024) (orig. proceeding) (citation modified). They "should be used as a tool, not a trapdoor." *Id.* (citation modified). So while trial courts have "broad discretion" to permit or deny a request to change an admission, *Marino v. King*, 355 S.W.3d 629, 633 (Tex. 2011); *Wheeler v. Green*, 157 S.W.3d 439, 443 (Tex. 2005), that is not unlimited, and a court's discretion is narrowest when denying permission to make the change would "compromise

36

presentation of the merits," *Wheeler*, 157 S.W.3d at 443; *see also AKT Invs., Inc. v. T Jordan Towing, Inc.*, No. 02-24-00413-CV, 2025 WL 1536389, at *21–22 (Tex. App.—Fort Worth May 29, 2025, pet. denied) (mem. op.).

That said, to obtain reversal of a judgment based on an error in the trial court, the appellant must show not only that the error occurred but also that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. Tex. R. App. P. 44.1(a); *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 225 (Tex. 2005).

Here, Haggard complains that the trial court should not have deemed admitted Blattner's six requests cited above because its doing so prevented his defending himself and precluded the trial court from deciding the case on the merits. But in deciding Haggard's first issue, we did not factor in those deemed admissions.

Thus, even if we were to agree that the trial court abused its discretion by deeming and then refusing to withdraw the six deemed admissions, Haggard can show no harm. This is so because in response to Blattner's summary-judgment motion, Haggard offered no evidence creating a fact question on whether it owed him any duty. *See* Tex. R. App. P. 44.1(a); *Morris v. Hughes*, No. 11-08-00224-CV, 2010 WL 252283, at *1 (Tex. App.—Eastland Jan. 21, 2010, pet. denied) (mem. op.) (per curiam) (concluding that an appellant had identified no harm from deemed admissions when she had not otherwise created a fact question in response to a no-evidence summary-judgment motion); *see also Allison v. Post-Newsweek Stations Hou.*

*LP*, Nos. 01-10-00775-CV, 01-11-00767-CV, 2011 WL 13362661, at *4 (Tex. App.—Houston [1st Dist.] Dec. 22, 2011, no pets.) (mem. op.) (holding that any error from merits-preclusive deemed admissions was harmless when other evidence supported the trial court's granting summary judgment). Accordingly, we overrule Haggard's second issue.

## IV. Conclusion

Having overruled Haggard's two issues, we affirm the trial court's judgment that Haggard take nothing from Blattner.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: February 26, 2026